# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENATO SALOMON,<br><br>                          Plaintiff,<br>vs.<br>ANDREA C. & ANDREA C. FISHING CORPORATION,<br><br>                         Defendants. | CASE NO. 06CV484 WQH (RBB)<br><br>ORDER ON MOTIONS IN LIMINE |

HAYES, Judge:

Pending before the Court are two motions in limine filed by Defendants Andrea C. and the Andrea C. Fishing Corporation (Docs. # 44-45), and one motion in limine filed by Plaintiff Renato Salomon (Doc. # 40). The Court heard oral argument on the these matters on Friday, February 29, 2008.

## BACKGROUND

On March 3, 2006, Plaintiff Renato Salomon filed the Complaint in this matter against Defendants Andrea C. and the Andrea C. Fishing Corporation. (Doc. # 1, *Complaint*). The Complaint asserts claims for negligence, unseaworthiness, failure to provide maintenance and cure, and statutory wage penalties under the Jones Act, and arises from an incident which occurred aboard the Andrea C. fishing vessel on January 17, 2005. (Doc. # 1); (Doc. # 39, *Pretrial Order*). Specifically, Plaintiff alleges that he was a crew member aboard the Andrea C. fishing vessel on January 17, 2005, and that he was injured when he slipped on an oily substance which Defendant caused to be on the Andrea C's

skiff. (Doc. # 1); (Doc. # 39). On June 7, 2006, Defendants filed an answer to the Complaint. (Doc. # 4).

On January 28, 2008, the parties appeared before the Honorable William Q. Hayes, United States District Judge, for a pretrial conference. (Doc. # 36). On January 29, 2008, the Court set the matter for jury trial to begin on March 24, 2008, and set a pretrial schedule for briefing motions in limine and filing pretrial documents. (Doc. # 38). On February 8, 2008, the parties filed the pending motions in limine. (Docs. # 40-44).

## DISCUSSION

### Plaintiff's Motions in Limine

**I. Plaintiff's Motion's in Limine # 1 - Motion to Exclude Expert Opinion That Plaintiff Had a Shortened Work Life as a Tuna Fisherman (Doc. # 40)**

Each party has retained an economic expert in this case who will testify as to the economic damages which Plaintiff has suffered as a result of his injuries. One component of economic damages in this case is Plaintiff's work-life expectancy. It is undisputed that Plaintiff is a citizen of the Phillippines and worked aboard the Andrea C. fishing vessel while the Andrea C. fished out of American Samoa.

Defendant's economic expert, Patrick Kennedy, PhD, came to the conclusion that the average tuna fisherman fishing out of American Samoa works until age 55, as opposed to age 60.97, the average retirement age for American males as calculated by the United States Bureau of Labor Statistics. (Doc. # 52-2 at 6-8). Kennedy based his opinion on United States Customs Service data showing the age and position of fishermen "on United States-flagged purse seiners fishing for tuna out of American Samoa." (Doc. # 52-2 at 7). In comparing the statistical work-life age created by the United States Bureau of Labor Statistics, 60.97, to the age predicted by Kennedy's data, 55, Kennedy noted that "[g]enerally, the statistical worklife tables provide a reliable estimate of the number of years that an individual is likely to remain attached to the United States workforce, but they do not always represent the most reliable measure of worklife for a particular individual." (Doc. # 52-2 at 6).

Plaintiff's motion in limine # 1 seeks an order excluding Dr. Kennedy from offering his opinion that Plaintiff may have had a reduced work-life as a tuna fisherman when compared to the

average male living in the United States. Plaintiff contends that Dr. Kennedy's study is "junk science," and that is opinion with respect to the life of a tuna fisherman is unreliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

*A. Standard for Admission of Expert Testimony*

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." FED. R. EVID. 402; *see also Kumho Tire v. Carmichael*, 526 U.S. 137, 141, 148-49 (1999).

The Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation, and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993). In serving this "gatekeeper" function, a district court performs a two-part analysis. *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002). First, a district court "must determine nothing less than whether the experts' testimony reflects scientific knowledge, whether their findings are derived by the scientific method, and whether their work product amounts to good science." *Daubert v. Merrell Dow Pharmaceuticals (Daubert II)*, 43 F.3d 1311, 1315 (9th Cir. 1995) (internal quotations and citations omitted). "*Daubert's* general holding–setting forth the trial judge's general 'gatekeeping' obligation–applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire*, 509 U.S. at 141. Second, the court "must ensure that the proposed expert testimony is relevant to the task at hand . . . i.e., that it logically advances a material aspect of the proposing party's case." *Daubert II*, 43 F.3d at 1315.

"Trial courts must exercise reasonable discretion in evaluating and in determining how to evaluate the relevance and reliability of expert opinion testimony." *United States v. Alatorre*, 22 F.3d 1098, 1102-03 (9th Cir. 2000). A trial judge has "considerable leeway" in deciding not only "how to go about determining whether particular expert testimony is reliable," but also in deciding whether the testimony is reliable. *Kumho Tire*, 509 U.S. at 153.

When considering whether expert testimony is reliable, a trial court should consider the factors laid out by the United States Supreme Court in *Daubert*, 509 U.S. at 593-595, including, (1) "whether

the theory or technique employed by the expert is generally accepted in the scientific community, (2) whether "it's been subjected to peer review and publication," (3) "whether it can be and has been tested," and (4) "whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316-17 (citing *Daubert*, 509 U.S. at 593-595). The United States Supreme Court noted that the trial judge's reliability inquiry is "flexible," and therefore trial courts can and should consider other factors not specifically mentioned by the United States Supreme Court in *Daubert*. *Daubert*, 509 U.S. at 594.

As noted by the Court of Appeal for the Ninth Circuit in *Daubert II*, "one very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert II*, 43 F.3d at 1317; *see also Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003). Where expert testimony is not based on independent research, "what is required is 'proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.'" *Clausen*, 339 F.3d at 1056 (citing *Daubert II*, 43 F.3d at 1318). However, where expert testimony is not based on independent research and has not been subjected to peer review and publication, the "proffer of scientific testimony may still be deemed reliable enough to be admitted." *Clausen*, 339 F.3d at 1056. Indeed, "there may well be good reasons why a scientific study has not been published," for instance–"it may be too recent or of insufficiently broad interest." *Id.* "Where peer review and publication are absent, 'the experts must explain precisely how they went about reaching their conclusions and point to some objective source–a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like–to show that they have followed the scientific evidence method, as it is practiced by (at least) a recognized minority of scientists in their field.'" *Id.* (citing *Daubert II*, 43 F.3d at 1319).

*B. Dr. Kennedy's Opinion With Respect to the Work-Life of a Tuna Fisherman*

Dr. Kennedy is an economist and Director with LECG, a company which provides expert services to many agencies and governments around the world. (Doc. 52-2 at 1). Dr. Kennedy holds a bachelor's degree in Economics from the University of California, San Diego, and a Doctorate in Economics from Stanford University. (Doc. 52-2 at 1). Dr. Kennedy's professional experience

"includes economic loss analysis projects within and outside of the litigation environment . . . ." (Doc. # 52-2 at 1).

Dr. Kennedy came to his conclusion with respect to the reduced work-life of a tuna fisherman working out of American Samoa by examining data kept by the United States Customs Service. Specifically, Dr. Kennedy examined the data to determine whether United States Bureau of Labor Statistics work-life tables adequately captured the work-life of tuna fisherman in American Samoa. (Doc. # 52-2). Dr. Kennedy's methodology included sorting "the age of the tuna fisherman in five-year brackets and [testing] whether the age distribution, or age profile, for tuna fisherman was significantly different from the age profile for male workers in the United States." (Doc. # 52-2 at 7). Defendants cite studies to support Dr. Kennedy's opinions, one of which shows that work-life tables created by the United States Bureau of Labor Statistics do not include persons working out of American Samoa. (Doc. # 52-5); *see also* (Doc. # 52 at 6 fns. 5, 8). Plaintiff has not refuted or challenged any study cited by Dr. Kennedy or Defendants.

Plaintiff's critique of Dr. Kennedy's opinion is that it has not been peer-reviewed and is based on information which is not published. However, Dr. Kennedy properly relied on information created by the United States Bureau of Labor Statistics, as well as on information gathered by the United States Customs Service, in developing his opinion. Furthermore, Dr. Kennedy explained his methodology precisely, and studies indicate that his analysis was a reliable way to assess the work-life of a tuna fisherman in American Samoa. Plaintiff does not challenge the manner in which Dr. Kennedy organized the accumulated data, and does not contend that Dr. Kennedy's use of five-year brackets was improper or unreliable.

As noted by the Court of Appeal for the Ninth Circuit, "the weakness in the underpinnings of [expert] opinions may be developed upon cross-examination," as "such weakness goes to the weight and credibility of the testimony" as opposed to its admissibility. *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n. 5 (9th Cir. 1987). After reviewing Dr. Kennedy's expert report and the briefing on Plaintiff's motion in limine, the Court concludes that Dr. Kennedy's opinion with respect to the work-life of a tuna fisherman will assist the trier of fact in this case, and is relevant and reliable under *Daubert*.

Plaintiff's motion in limine # 1 (Doc. # 40) is DENIED.

### Defendants' Motions in Limine

**I. Defendants' Motion in Limine # 1 - Motion for an Order Excluding Previously Unexplored Theories of Liability (Doc. # 44)**

On November 22, 2006, Plaintiff answered special interrogatories propounded by Defendants, and noted that Plaintiff's theory of liability was that "Defendant allowed hydraulic fluid to leak from a hose into the skiff." (Doc. # 44-2). Plaintiff has not amended its responses to Defendant's special interrogatories since November 22, 2006, and has never asserted any other theory of liability in this case.

Defendant's motion in limine # 1 (Doc. # 44) seeks to preclude Plaintiff from arguing or submitting evidence to support any theory of liability other than that Defendant allowed an oily substance to leak onto the skiff. Specifically, Defendant seeks to preclude Plaintiff from arguing that Plaintiff's job was inherently dangerous.

On February 15, 2008, Plaintiff filed a "statement of non-opposition in principle" to Defendant's motion in limine # 1. (Doc. # 51). In the statement of non-opposition Plaintiff noted as follows: "plaintiff does not intend to argue to the jury, and will not seek a jury instruction that the work plaintiff was performing and/or the manner in which plaintiff performed his job duties "was an inherently dangerous work method" or that Defendants are liable for plaintiff's injuries on some "inherently dangerous" work theory. (Doc. # 51 at 1). At oral argument on the motions in limine Plaintiff's counsel further noted that Plaintiff did not believe, and would not testify, that Plaintiff's job or duties were dangerous or inherently dangerous.

Plaintiff has indicated that it will not introduce or argue any theory of liability other than that Defendants caused an oily substance to leak onto the skiff. Accordingly, Defendants' motion in limine # 1 (Doc. # 44) is GRANTED.

**II. Defendants' Motion in Limine # 2 - Motion to Exclude Testimony of Joyce Pickersgill Re: Lost Health Benefit (Doc. # 45)**

Plaintiff's economics expert, Joyce Pickersgill, included three components in her calculation of Plaintiff's future economic loss: (1) lost wages, (2) a lost meal benefit, and (3) a lost health benefit.

1  (Doc. 45-2 at 1-2).  Defendants seek to exclude Pickersgill's testimony regarding the lost health
2  benefit.  Specifically, Defendants contend that Pickersgill's opinion with respect to the lost health
3  benefit is neither relevant nor reliable under *Daubert*.

4  In calculating Plaintiff's lost health benefit, Pickersgill noted that "[t]here is no way to measure
5  directly the value of the cure" under the Jones Act.  (Doc. # 45-3 at 90).  Accordingly, Pickersgill used
6  Blue Cross of California health plans as a proxy for cure in calculating Plaintiff's lost health benefit.
7  (Doc. # 45-3 at 56, 90).  Pickersgill "averaged all of the premiums for a single person" in the Blue
8  Cross health plans, and "took an average of a single premium of $232 a month."  (Doc. # 45-3 at 55-
9  56).  Thereafter, Pickersgill "deducted the number of days" that Plaintiff would not have been on the
10 vessel in the normal year.  (Doc. # 45-3 at 56).  Though it is undisputed that Plaintiff is a citizen of
11 the Phillippines, Pickersgill did not know whether Plaintiff would be entitled to benefits in the
12 Phillippines, and Plaintiff's counsel admitted at oral argument that Plaintiff has never lived in the
13 United States.

14 Defendants contend that Pickersgill's opinion with respect to the lost health benefit is
15 irrelevant and unreliable.  Defendants contend that the cure benefit is not equivalent to American
16 health care, and that there is no authority for the proposition that a lost health benefit is recoverable
17 under the Jones Act.  Defendants further contend that Plaintiff is a citizen of the Phillippines, and that
18 calculating Plaintiff's potential damages based on the cost of American health care plans is improper,
19 irrelevant, and misleading because Plaintiff cannot purchase a Blue Cross of California health care
20 plan in the Phillippines.  Finally, Defendants note that Pickersgill did not know how the Blue Cross
21 of California health care plans compared to those health plans available in the Phillippines, or whether
22 the Phillippines had "national health care where [Plaintiff] wouldn't have to pay anything."  (Doc. #
23 45-3 at 90).

24 In order for an expert's opinion to be admissible, it must be sufficiently reliable so that it will
25 assist the trier of fact, and it must be more than just "subjective belief or unsupported speculation."
26 *Daubert*, 509 U.S. at 589-90.  In this case, it is undisputed that Plaintiff is a citizen of the Phillippines,
27 and the parties agree that Plaintiff will not purchase a health care plan in the United States.  In
28 addition, Plaintiff has not established that Pickersgill compared the Blue Cross of California health

care plans to any private or public health care plan available to Plaintiff in the Phillippines, or that Pickersgill otherwise incorporated those services which would be available to Plaintiff in the Phillippines into her lost health benefit opinion.

After reviewing the briefing on Defendant's motion in limine # 2, the Court finds that Pickersgill's lost health care benefit opinion, which uses Blue Cross of California health care plans as a proxy for benefits which may or may not be available in the Philippines, is irrelevant and unreliable under *Daubert*. Plaintiff has not established any relationship between the California Blue Cross health care plans and health care which may be available to Plaintiff in the Phillippines. Accordingly, Pickersgill's opinion as to the lost health care benefit is only "subjective belief or unsupported speculation," and neither will support admissibility. In addition, Plaintiff has not established that a lost health care benefit is recoverable under the Jones Act. The Court concludes that Pickersgill's opinion with respect to the lost health care benefit must be excluded.

Defendant's motion in limine # 2 (Doc. # 45) is GRANTED.

## CONCLUSION

Plaintiff's motion in limine # 1 (Doc. # 40) is DENIED.

Defendant's motion in limine # 1 (Doc. # 44) is GRANTED.

Defendant's motion in limine # 2 (Doc. # 45) is GRANTED.

**IT IS SO ORDERED**.

DATED: March 11, 2008

**WILLIAM Q. HAYES**
United States District Judge